WALTER BROTHERS v. REED & GERARD.

[FILED MAY 18, 1892.]

1. **Sale: DELIVERY: FAILURE TO TENDER CASH PAYMENT.** Where a party sold 150 fat cattle at three and one-half cents per pound to be delivered on a day named, and received $500 as part of the purchase price, the remainder to be paid upon the delivery of the cattle, *held*, that the delivery of the cattle and payment therefor were concurrent acts and that the proof showed that the purchaser did not have the money with him to pay for the cattle although he may have had credit in a distant bank, and that he did not offer to make payment in money.

2. ——: **MONEY ADVANCED BY PURCHASER FORFEITED BY SUBSEQUENT DEFAULT.** If a purchaser has advanced money in part performance of a contract, and without fault on the part of the seller refuses to proceed, the seller being ready and willing to perform on his part all the stipulations of the agreement, the purchaser cannot recover back what he has paid.

3. Instructions set out in the opinion, *held*, to be erroneous.

ERROR to the district court for Thayer county. Tried below before MORRIS, J.

Walter v. Reed.

*O. H. Scott, W. O. Hambel, S. L. Geisthardt,* and *Charles S. Lobingier,* for plaintiffs in error:

Where the purchase money is to be paid when the goods are delivered, the plaintiff must plead and prove that he was able, ready, and willing to pay the purchase money at the time and place of delivery. (2 Parsons, Con., 525*, 677*; *Topping v. Root,* 5 Cow. [N. Y.], 404; *Vail v. Rice,* 5 N. Y., 156; *Bronson v. Wyman,* 8 Id., 188; *Porter v. Rose,* 12 Johns. [N. Y.], 209; *Morton v. Lamb,* 7 T. R. [Eng.], 125; *Rawson v. Johnson,* 1 East [Eng.], 203; *Morrison v. Ives,* 4 S. & M. [Miss.], 660. The verdict is excessive and it is the duty of a reviewing court to correct the mistake. (*Jennings v. Simpson,* 12 Neb., 558; *Fried v. Remington,* 5 Id., 525.) The measure of damages is the difference between the contract price and the market price at the time and place of delivery, without estimating probable profits. (*French v. Ramge,* 2 Neb., 260, and cases; *Goodrich v. McClary,* 3 Id., 120; *Markel v. Moudy,* 11 Id., 213; *Wasson v. Palmer,* 13 Id., 378.) Hence the court erred in admitting evidence as to the price of cattle during the latter part of May and July. The court erred in admitting evidence against defendants' objection, as to expenditures by defendants in error for hiring hands, renting pasture, and other preparations, since there is no allegation that the defendants below had any knowledge of the same. (*Johnson v. Mathews,* 5 Kan., 118; *French v. Ramge,* 2 Neb., 254; *Sycamore Co. v. Sturm,* 13 Id., 215; *Bridges v. Lanham,* 14 Id., 369; *Aultman v. Stout,* 15 Id., 586; *Batchelder v. Sturgis,* 3 Cush. [Mass.], 201; *Hayden v. Cabot,* 17 Mass., 169; *Clark v. Moore,* 3 Mich., 55; 1 Sutherland, Damages, sec. 4, and cases cited; Anson, Contracts, 310.) The court erred in preventing the cross-examination of Thos. Gerard by counsel for the defendant. (2 Rumsey's Prac., 275; *Langley v. Wadsworth,* 99 N. Y., 61; *Olive v. State,* 11 Neb., 24; *Stanton Co. v. Can-*

38

*field*, 10 Id., 387.) It was error to instruct the jury that the plaintiffs might break their contract, and still recover back the money advanced by them, unless the defendants could show damages to them as a result of such breach. (*Green v. Green*, 9 Cow. [N. Y.], 46; *Battle v. Bank*, 3 N. Y., 88; *Leonard v. Morgan*, 6 Gray [Mass.], 412; *Hansbrough v. Peck*, 5 Wall. [U. S.], 506; *Haynes v. Hart*, 42 Barb. [N. Y.], 58; *Ellis v. Hoskins*, 14 Johns. [N. Y.], 363; *App'eton v. Chase*, 19 Me., 74; *Dwinel v. Howard*, 30 Id., 258; *Ex parte Barrell, In re Parnell*, L. Rep., 10 Ch. App. [Eng.], 512; *Depree v. Bedborough*, 4 Giff. [Eng.], 479; *Thomas v. Brown*, L. R. 1, Q. B. Div. [Eng.], 714; *Lethbridge v. Kirkman*, 25 L. J. [N. S.], Q. B. [Eng.], 89; *Cleave v. Moors*, 3 Jur. N. S. [Eng.], 48; *Dowdle v. Camp*, 12 Johns. [N. Y.], 451; *Abbott v. Draper*, 4 Denio [N. Y.], 51; *Collins v. Coats*, 17 Barb. [N. Y.], 471; *Cobb v. Hall*, 29 Vt., 510.)

*M. Savage, contra,* cited, contending that the verdict was not excessive and should be upheld: *A. & N. R. Co. v. Jones*, 9 Neb., 71; *Murphy v. State*, 15 Id., 383; *Jones v. Edwards*, 1 Id., 170; *Brown v. Hurst*, 3 Id., 356; *Mc-Gatrick v. Wason*, 4 O. St., 566; *Seymour v. Street*, 5 Neb., 89; *Converse v. Meyer*, 14 Id., 190; *Storms v. Eaton*, 5 Id., 459; *Everett v. Hobleman*, 15 Id., 376; *Durrell v. Hart*, 25 Id., 610; *Forbes v. Thomas*, 22 Id., 541.

MAXWELL, CH. J.

This is an action by purchasers against the seller to recover for an alleged failure to deliver 150 fat steers according to contract. On the trial of the cause the jury returned a verdict in favor of the defendants in error for the sum of $1,000, upon which judgment was rendered. It appears from the record that Reed & Gerard, who were stockmen, entered into a written contract with the Walter Brothers, who were engaged in a similar business, by the terms of which

the Walter Brothers agreed to deliver to Reed & Gerard, twelve hours off feed and water, 150 head of good, smooth grade native two and three year old steers, none to weigh less than 900 nor over 1,050 pounds, at Davenport, Neb., between April 20 and May 5, 1888, at buyers' option. Reed & Gerard paid the sum of $500 on the contract at the time of its execution. The contract as at first executed expressed no price at which the cattle were to be delivered. Afterwards, by mutual consent, a clause was added fixing the price at three and one-half cents per pound, it appearing that this had been the price intended. Walter Brothers collected 152 head at their farm near Davenport, the place of delivery, and notified Reed & Gerard that they were ready to deliver. Gerard, in response to the notice, appeared and examined the cattle on the evening of May 4; they were shut off from feed and water, Gerard assisting in the operation, and were weighed early in the morning following; but Gerard did not take the cattle away with him. The cattle were never taken by Reed & Gerard, but remained in the possession of Walter Brothers for some months thereafter.

Reed & Gerard, for their cause of action contend, that the cattle were not of the kind required by the written contract; that a large number of them would run in weight outside the limits specified in the contract; that the Walter Brothers did not have the requisite number of the size and weight for delivery at the place designated; and that for this reason, and no other, they refused to take the cattle and pay the balance of the purchase price; and for all of which they claim damages in the sum of $2,000.

Walter Brothers, for their defense, maintained that after the original written contract had been signed they discovered that it would be extremely difficult to comply strictly with its terms; that on the occasion when the clause expressing the price to be paid was added, which was done

at Gerard's request, this contract was modified by an oral agreement, according to which they were required to furnish cattle whose average weight only should be between 900 and 1,050 pounds, and Reed & Gerard were to advance a further sum of $1,000 on April 1, and that Reed & Gerard rented a pasture of them for the sum of $275 to be paid on April 1; that they purchased and collected the cattle pursuant to this agreement, and had them ready for delivery on the 4th day of May, 1888; that Gerard appeared and examined the cattle, and was well satisfied with them, and accepted them, but that Reed & Gerard had no money to pay for the cattle, and failed to pay or tender the amount which was then due, and they claim damages in the sum of $1,150.

The plaintiffs, in their reply, deny that the original contract was ever modified orally in any way. In the first paragraph of the petition the defendants in error allege "that at Davenport, Nebraska, on January 24, 1888, the defendants sold to plaintiffs the following described personal property, to-wit: 150 head of good, smooth grade two and three year old steers, none to weigh less than 900 nor more than 1,050 pounds, for the sum of $3\frac{1}{2}$ cents per pound, said cattle to be delivered at Davenport, Nebraska, between April 20 and May 5, 1888, at the option of the plaintiffs, the plaintiffs paying to the defendants thereon at the time they purchased the same the sum of $500, the balance to be paid on the delivery of said cattle to the plaintiffs as aforesaid." This is denied in the answer.

J. J. Walters, one of the plaintiffs in error, testified that on the evening of May 4, Mr. Gerard came to take the cattle away on the next day. His direct testimony as to what was done is as follows: "He (Gerard) made a specialty of chasing off every steer in the yard, and we went through the whole yard, and when we came to one white headed stag I told him he need not take that under the contract, and then we had a dun steer weighing 700 pounds,

and I told him he need not take that, but he said he would rather have them, as he wanted to go away.  He said, " I will take the steers, every one that you have got."

Q. Did you have 150 besides these ?

A. Yes, sir ; I had 152 cattle.

Q. What did you do then ?

A. Then after we went out there and after he consented to take these steers, and as we passed in through the gate he wanted us to stop, and when we came around he drew out a letter of some kind.  I could not read it nor my brother could not read it, but he tried to explain what it was, and he said he would have to go to the bank to make arrangements, and I would have to go along to get this money to pay for the cattle, and between 4 and 5 o'clock. I and Gerard went to the bank of Davenport, the People's Bank, and when I came in I introduced Pratt to Gerard.

Q. Who is Pratt?

A. Cashier of the Davenport bank, and he told him he wanted to make some arrangements to pay for these cattle; that they suited him.  He said, " they suit me and are all right," and Pratt and he had some conversation, and he handed that letter to Pratt, but he could not make out what it was; he could not make out what the signature was; he tried to read it himself.  We suppose it was written in a hurry.

Q. Go on and state the conversation.

A. And then Pratt spoke up and said, "Gerard, what kind of cattle are these?" and Gerard spoke up and said, "They are a nice bunch of cattle, and I will take them," and Gerard said he came up here to make some arrangements to get the money, and Pratt spoke up and said "You can get the money provided the Walter Brothers indorse your check," and I said " I don't indorse other people's checks," and him and Pratt talked a while then. I cannot recollect exactly what their words were.

Q. Did he get the money?

A. No, sir. He would not give him the money without I would indorse the check, and I would not indorse it.

Q. What did you then, where did you go?

A. I and Gerard went back to the feed lot, and Gerard ordered the cattle to be shut off from water and feed at 4 o'clock. I told him I could not get any one to weigh the cattle at that time. He said, " Well we will let it go until 6 o'clock." Then Gerard ordered the water shut off. Gerard nailed up the trough, and after all that was done he said, " Now this is according to contract, we want these cattle weighed early in the morning, so we can get off."

Q. Was this in the evening or morning?

A. This was in the evening, on the 4th of May, 1888.

Q. That was when you shut off the water?

A. Yes, sir. They were to stand twelve hours off from feed and water.

Q. State to the jury what Gerard said and did there at that time.

A. He said this was according to contract, and he shut off the water. We furnished the board, and he nailed the water trough up, and after everything was done according to contract we went to supper, and that was the last done until in the morning.

Q. What time in the morning?

A. At 6 o'clock.

Q. What was done then?

A. At 6 o'clock Gerard came up from town and ordered me to get out my hands to weigh the cattle, and I and Gerard and E. C. went up through the yards, and Gerard stood between the lane that runs down by the water trough from the yard they were in, in the east yard, and from there to the north yard, and through that to the scale yard, and there we commenced weighing the cattle. There were no objections, and nothing said about it. We went on and weighed the cattle. We drove the cattle in the scale yard and F. C. weighed them, and Gerard took the

weights, and there was nothing said until the cattle were all weighed. We went to the house and computed the amount, and I believe the amount was $5,049.10 that the cattle came to, and they had paid $500, which made $4,949.10 ($4,549.10). I told them it would take that money to move the cattle.

Q. What did he say?

A. He said he didn't have the money. Then he commenced squirming. He said that I would not indorse the check, and that was the only way he would take the cattle.

Q. Did he say that was the only way he could take the cattle?

A. Yes, sir.

He also testifies that the 152 head weighed 144,260. Mr. Gerard does not deny that he sought to raise the money to pay for the cattle, as shown by this testimony. He, in effect, admits it by offering to prove that they had the money in a bank at Superior. Under a contract of this kind the seller has a right to insist upon the cash on the delivery of the property, and he cannot be required to take a check or instrument which may require his indorsement and consequent liability to procure the money.

The clear preponderance of the proof shows that the defendants in error were satisfied with the cattle and would have taken them if the plaintiffs had not insisted upon payment upon delivery.

The court instructed the jury as follows: "If you find that the plaintiffs did not purchase such cattle on the refusal and neglect of the defendants to deliver the same under the contract, but that the plaintiffs had paid to the defendants as an advance on said contract any sums of money, and that the cattle were not delivered by the defendants under such contract, then the plaintiffs would be entitled to recover back from defendants such sums of money so paid them in advance on said contract, together with seven per cent interest from the time of the payment

of the same to the 17th day of the present month, which is the first day of the term of this court, unless you shall find, as alleged by the defendants, that such written contract was by mutual consent of the parties thereto so altered and changed that such delivery of cattle as contemplated in the contract was not necessary, but that said written agreement was changed by an oral agreement, and delivered or tendered to said plaintiffs under said oral agreement the cattle as by said oral agreement contemplated, and that said defendants have suffered damages by the refusal or neglect upon the part of the plaintiffs to receive and pay for the cattle so delivered or tendered.

"Ninth—As a general rule, upon the neglect or refusal of a party to receive and pay for the goods and chattels enumerated in the contract, the party so selling has a right to go upon the market and sell such goods and chattels, and his damage would be the difference between the price obtained for said goods and chattels when so sold upon the market and the price agreed to be paid for said goods by the person making a contract for the same, together with the costs, expenses of making such sale, and the expenses of keeping and caring for such goods and chattels until the same was sold, with legal interest, would be the damage the party would be entitled to recover; or, the party may elect to retain such goods and chattels and recover from the purchaser such damages as he may have sustained by reason of the failure on the part of a purchaser to comply with the terms of his contract.

"Tenth—If a party elect to retain such goods and chattels, it is incumbent upon him to show that he has sustained damage in fact; if he does not show that he has suffered damage by reason of the failure of a party to carry out a contract, he cannot recover, but if he retain the goods and chattels and suffered no damage by reason of the non-fulfillment of the contract, he will be required to return such sum as he has received as advancement upon said contract,

together with interest on the same from the time that the contract should have been performed by the parties thereto."

These instructions are clearly erroneous. The rule is, that if a person has advanced money in part performance of a contract and then refuses to proceed, the other party being ready and willing to perform on his part all the stipulations of the agreement, the former will not be permitted to recover back what he has advanced. (*Chrisman v. Miller*, 21 Ill., 236; *Hansbrough v. Peck*, 5 Wall. [U. S.], 506; *Green v. Green*, 9 Cow. [N. Y.], 46; *Battle v. Rochester*, 3 N. Y., 88; *Leonard v. Morgan*, 6 Gray [Mass.], 412.) As stated by Tiedeman on Sales, sec. 93: " When there is no agreement for future payments the sale becomes a cash transaction, in which the delivery of the goods and the payment of the price are concurrent and interconditional acts. (*Haskins v. Warren*, 115 Mass., 533; *Phelps v. Hubbard*, 51 Vt. 489.)" The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.